UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARLO GATEWOOD,

        Plaintiff,         CIVIL NO. 07-13326
                                                  Judge Victoria A. Roberts
-v-                                             Magistrate Judge Steven D. Pepe

MICHAEL J. ASTRUE,
COMMISSIONER
OF SOCIAL SECURITY,

        Defendant.
_____

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Marlo Gatewood ("Plaintiff") brought this action under 42 U.S.C. § 405(g) and § 1681(c)(3), as amended for judicial review of the Commissioner's final decision denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act for the period of December 26, 1999 through June 1, 2001. Both parties have filed motions for summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED.**

**A.    Procedural History**

Plaintiff applied for supplemental security income under the Social Security Act ("the Act") in 1999, 2000, and 2001, alleging that she became disabled on December 26, 1997 (R. 60), as a result of depression, anxiety attacks, arthritis, alcoholism, asthma, knee problems, and sarcoidosis (R. 82). The application was initially denied and Plaintiff did not pursue her 1999

1

claim beyond the initial determination. (R. 57-59, Pl.'s Br. at 1). With respect to her 2000 application, Plaintiff's claim was denied at the state agency level and she requested a hearing before Administrative Law Judge Alfred Varga ("ALJ") (R. 38-39). A hearing took place January 11, 2001, where Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE") (R. 547-76).

On March 23, 2001, ALJ Varga found Plaintiff was not under a disability as defined by the Act because she remained capable of performing a significant number of jobs existing in the economy (R. 520-29).

Plaintiff requested review of this decision by the Appeals Council. On March 22, 2004, the Appeals Council granted this request and vacated the ALJ's decision. It remanded the case for resolution of several issues allowing Plaintiff the opportunity to review additional evidence received by the ALJ after the hearing but not provided to the Plaintiff or her counsel and to clarify nature and severity of the Plaintiff's mental impairments during the relevant period (R. 535-37). The Appeals Council noted that Plaintiff's June 2001 benefit application had been granted and held that it would not disturb the finding of disability beginning June 1, 2001 (R. 535). Thus, the relevant period, covered by the second claim, is from December 26, 1999, to June 1, 2001.

The new hearing took place on February 8, 2005, where Plaintiff again appeared with counsel and VE Christian Barrett testified (R. 547). Considering Plaintiff's age, education, past work experience, and residual functional capacity ("RFC"), and relying on the testimony of the VE, ALJ Varga concluded in a decision dated July 11, 2005 (the "decision") that Plaintiff was not under a disability during the relevant period as defined by the Act because she remained

capable of performing a significant number of jobs existing in the economy (R. 17-23).

Thereafter, the Appeals Council denied Plaintiff's request for review (R. 8-10), and Plaintiff seeks judicial review of the ALJ's decision.

## II. STATEMENT OF FACTS

1. *<u>Plaintiff's Testimony and Statements</u>*

Plaintiff was 34 years old on the date of the ALJ's July 11, 2005, decision (R. 17). She completed high school as well as two years of college (R. 74), and had prior work experience as a cashier (R.69). Plaintiff testified that she was no longer able to work because of knee joint pain, muscle spasms, sarcoidosis, depression, suicide attempts as well as auditory and visual hallucinations (R. 582-584).

At the hearing, Plaintiff described her daily activities (R. 582- 584). She testified that she cannot brush her own teeth or hair (R. 582). When she is suffering from a hallucination she is frightened to the degree that she cannot sleep (R. 584). She lives an isolated life except for the relationship with her children who live with her (R. 584).

Plaintiff described her treatment from psychiatrists who prescribed medication and participating in group therapy (R. 584-86). These modes of treatment provided her little to no relief (R. 584).

    2. *Medical Evidence*

       *a. Physical Impairments*

The claimant has been diagnosed with pulmonary sarcoidosis (R. 150-51) In February 1999, Drs. I.. Khademi and Michael E. Shy, evaluated Plaintiff for complaints of occasional

episodes of dizziness, blurred vision and headaches. She exhibited 5/5 symmetrical strength throughout all the extremities, intact coordination, normal deep tendon reflexes and was alert, awake and oriented (R. 159-64).

On March 14, 1999, the Plaintiff went to the emergency room complaining of difficulty breathing (R. 168-79). Domian F. Kandah, D.O., diagnosed her as having acute exacerbation of asthma and acute bronchitis (R. 168). She followed up, as recommended, with her treating physician, Loutfi Aboussaouan M.D., who diagnosed her with well-controlled stage I sarcoid and reactive airway disease (R. 214-15) Dr. Aboussaouan noted that the Plaintiff had some skin lesions possibly reflecting recent activity of the sarcoidosis (R. 215).

On July 27, 1999, E. Pearl, M.D., performed a consultative evaluation for DDS (R. 180-82). The Plaintiff complained of occasional asthma attacks secondary to humidity or stress. She exhibited a normal gait, clear lungs, a normal cardiac evaluation, no limitation of motion of any joints, normal handgrip, and normal strength throughout all the extremities. Dr. Pearl noted also that the Plaintiff had an emotional problem, alcohol abuse and obesity (R. 182).

On August 27, 1999, Elizabeth Edmond M.D., also performed an examination for DDS (R. 186-201). She found the Plaintiff's pulmonary function study to be normal and indicated that she had not needed an inhaler for over a month (R.186- 89). The claimant exhibited negative straight leg raising, good grip strength, good dexterity, no lumbar spine muscle spasm, full range of motion of the cervical and lumbar spine, and full range of motion of the shoulders and elbows. Dr. Edmond noted that a past psychiatric evaluation could be helpful to determine the extent of Plaintiff's depression (R. 189).

On September 1, 1999, an x-ray was performed on Plaintiff's left knee because of

4

continued pain (R. 284). The x-ray indicated no fracture, dislocation or bony erosions but there was some hypertrophic change seen along the medial disc space and inferior patellofemoral joint (R. 284).

On September 14, 1999, a pulmonary function analysis was performed with normal results (R. 210- 12).

On January 24, 2000, Plaintiff tested positive for opiates (R. 263).

In February 2000. the Plaintiff was evaluated for complaints of right arm and left knee problems at the Detroit Medical Center (R. 253-57). She was prescribed medication to help with the pain (R. 258)

On November 13, 2000, I.S. Villarosa, M.D., found Plaintiff's chest x-ray to be normal and the x-rays of the knees indicated degenerative arthritis (R. 396).

On November 21, 2000, Plaintiff returned to Dr. Aboussouan seeking further treatment for her asthma and sarcoidosis (R. 433). He noted that she appeared fairly stable without the use of prednisone (R. 433).

On December 15, 2001, J. Patricia Dhar, M.D., reviewed Plaintiff's records confirming the diagnosis for sarcoidosis (R. 398).

In March 2001, the Plaintiff underwent a sleep study and was again seen by Dr. Aboussouan on March 27, 2001 (R. 421-27). He concluded that there was a mild degree of obstructive sleep apnea and her sarcoidosis was stable (R. 421).

In May 2001, the Plaintiff was evaluated for complaints of lower right abdominal pain and lumbar strain by Patricia Wilkerson, M.D. (R. 454-56). Dr. Wilkerson could not make a diagnosis but felt comfortable that the problem was not life threatening (R. 454 and 456).

5

### b. Mental Impairments

The claimant has been diagnosed with major depression, anxiety disorder, dependent and avoidance personality traits, problems with primary support group, intermittent explosive disorder, dysthymic disorder, chronic alcohol abuse and possible panic disorder with agoraphobia (R. 165-67, 183-85, 498-500).

On February 18, 1999, psychiatrist V. Lingam, M.D., performed a mental status examination (R. 165-67). Dr. Lingam noted the Plaintiff's mental health history, which included being hospitalized at the age of 12 or 13 for depression, crying spells and skipping school. At that young age, she stayed at the psychiatric hospital for two months and upon discharge, attempted suicide by overdose. Dr. Lingam diagnosed Plaintiff as suffering from Major Depression, Recurrent, Anxiety Disorder, NOS, Alcohol Abuse on Axis 1 and Dependent and Avoidance Personality Traits on Axis II (R. 166). Dr. Lingam continued Plaintiff on Prozac (R. 166).

On July 28, 1999, Basivi Baddigam, M.D., Psychiatrist, performed a psychiatric evaluation of Plaintiff for DDS (R. 183-85). Dr. Baddigam noted that Plaintiff has been feeling depressed for 15 years because of abuse and molestation during her childhood and twice attempted suicide (R. 183). Plaintiff denied suffering from hallucinations, delusions, paranoid ideations, persecutions or unusual powers (R. 184). The doctor diagnosed Plaintiff as having alcohol dependence, intermittent explosive disorder, dysthymic disorder and possible panic disorder with agoraphobia (R. 185).

On September 26, 2001, psychiatrist F. Qudir, M.D., evaluated Plaintiff and conducted a Mental Residual Functional Capacity Assessment (R. 498-504). Dr. Qudir diagnosed Plaintiff as

suffered from Major Depression with psychosis (R. 499). According to Plaintiff, her condition had "worsened in the last few months and recently she has started to hear voices and when she is more depressed." (R. 498). The doctor noted that she was able to do light household chores but cannot cook a proper meal. Plaintiff spent most of her day looking out the window or listening to music (R. 498).

On October 11, 2001, Edward A. Czarnecki, Ph. D., performed a mental residual functional capacity assessment finding that Plaintiff was markedly limited in her ability to understand, remember and carry out detailed instructions, concentrate for extended periods of time, perform activities within a schedule, sustain a routine without special supervision, complete a normal workday, interact with the public, get along with coworkers and set realistic goals (R. 501-19). Dr. Czarnecki wrote that Plaintiff had depression and psychosis, behaves erratically and her social functioning was grossly impaired (R. 503).

### 3. *Vocational Evidence*

VE Christian Barrett testified that Plaintiff's past work in food preparation, stock clerk and cashier as unskilled and light exertional level (R. 587). Plaintiff did not acquire any transferable skills from these jobs (R. 587).

ALJ Varga asked VE Barrett whether an individual of Plaintiff's age, education, and work experience could perform any of his past relevant jobs or any other work is Plaintiff's descriptions of her limitations were taken as accurate (R. 587-88). VE Barrett responded that Plaintiff would not be able to perform any work on a competitive basis. He indicated that preclusive factors would include Plaintiff's degree of depression, and suicidal ideation together with visual and auditory hallucinations, chronic pain in her knee and spasms in her hand (R.

7

588).

The ALJ then asked VE Barrett whether an individual of Plaintiff's age, education, and work experience could perform any jobs if that individual was limited to sedentary work with a sit/stand option, lifting no more than 5 pounds, performed indoors free of dust, fumes and atmospheric pollutants, no unprotected heights or work around dangerous machinery and was simple and routine work (R. 588-89) Further, the individual would have little to no contact with others (R. 589).

The VE testified that such an individual could not perform Plaintiff's past relevant work Yet, there were other jobs that fit the parameters of the ALJ's hypothetical, including about 5,000 jobs in bench type operations involving packing, sorting, inspection and assembly (R. 589).

### 4. *ALJ Varga's Decision*

ALJ Varga found that Plaintiff met the insured status requirements of the Social Security Act from December 26, 1999 through May 31, 2001, and that she had not engaged in substantial gainful activity since her alleged onset date (R. 22). He found that Plaintiff's pulmonary sarcoidosis, degenerative arthritis of both knees, complaints of multiple joint pain, mild obstructive sleep apnea, major depression, anxiety disorder and history of chronic abuse were "severe" impairments within the meaning of the Regulations, but not "severe" enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, or Regulations No. 4 (R. 22).

ALJ Varga found that Plaintiff retained the residual functional capacity ("RFC") for sedentary work with the ability to alternate between sitting and standing as needed, no lifting

8

over five pounds, an indoor pollutant free environment, no work around unprotected heights, no climbing, no driving, no work around dangerous machinery, only simple and routine tasks, a low stress work environment, and limited contact with the public, coworkers and supervisors (R. 22).

The ALJ found that Plaintiff's allegations regarding her limitations were not totally credible because they were not fully corroborated by the objective medical evidence (R. 22). Further, her purported limitations did not prevent her from engaging in many activities of daily living such as personal care, taking a bus, caring for her children, performing household chores, cooking and retaining the ability to manage benefit funds (R. 20).

## II. Analysis

In her motion for summary judgment, Plaintiff argued that (1) The ALJ's decision was not supported by substantial evidence because her subsequent application with an onset date of June 1, 2001 was granted; (2) The ALJ denied her a full and fair hearing and demonstrated a total disregard of Plaintiff's case; and (3) The ALJ failed to consider Plaintiff's obesity as a component of her disability claim (Dkt. #11).

### A. <u>Standards of Review</u>

Plaintiff must establish that she was disabled during the relevant period of December 26, 1999 to June 1, 2001. *See* 42 U.S.C. § 416(I); 20 C.F.R. §§ 404.131(a), 404.320(b)(2); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment(s) must be of such severity that the individual can neither do her previous

work nor engage in any other kind of substantial gainful work which exists in the national economy, considering her age, education, and work experience. *See id.* § 423(d)(2)(A).

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. *Id.* If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm. *Studaway v. Secretary of HHS*, 815 F.2d 1074, 1076 (6th Cir. 1987); *Kirk v. Secretary of HHS*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry the burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her

10

past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects. A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform. *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

**B.** **Factual Analysis**

*I. Substantial Evidence exists to support the ALJ's determination that the Plaintiff was not disabled during the relevant period*

Plaintiff argues that because she was found disabled on June 1, 2001, the ALJ was required to find substantial evidence to support the denial of benefits for the time period between December 26, 1999 and June 1, 2001 (Dkt. #11, p. 7). This substantial evidence needed to be in the form of "an event, an examination, exacerbation, crisis or some criteria to distinguish May 31, 2001 from June 1, 2001." (Dkt. #11, p. 7). The core of Plaintiff's argument is that the ALJ was obligated to find her disabled because of the subsequent application. This is not the standard. The ALJ was required to consider evidence from the relevant period and then

11

determine Plaintiff's residual functional capacity.

The ALJ's finding that Plaintiff retained the ability to perform a limited range of sedentary work, so long as she was restricted to: lifting up to 5 pounds; a pollutant-free environment; no climbing, driving, work around dangerous machinery, or work around unprotected heights; limited contact with the public, co-workers, and supervisors; and only simple, routine work was supported by substantial evidence (R. 22).

The ALJ articulated many of the objective medical findings from the relevant period to support the RFC finding. In November 2000, Dr. Villarosa found Plaintiff's chest x-ray to be normal and x-rays of knees indicated degenerative arthritis (R. 396) and Dr. Aboussouan, her treating physician, found that her asthma and sarcoidosis appeared fairly stable without the use of prednisone (R. 433). Furthermore, the ALJ largely credited many of Plaintiff's claims of limitation. For example, she complained in August 1999 of chronic left knee pain; accordingly, the ALJ limited her to sedentary work with the option to sit or stand at will. And, as Dr. Aboussouan found her sarcoidosis to be well controlled, the ALJ nevertheless required her work environments to be pollutant free and the sedentary nature of her work would control for shortness of breath. Taking into account Plaintiffs complaints to Drs. I. Khademi and Micahel E. Shy of occasional dizziness (R. 159-161), the ALJ restricted her from working around unprotected heights, machinery, climbing, or driving (R. 20).

As for Plaintiff's mental limitations, the ALJ considered the evidence for the relevant period. The ALJ acknowledged Plaintiff's long history of depression and suicide attempts, as well as the diagnoses of depression, anxiety, and alcohol abuse (R. 20). 20 C.F.R. §416.920a requires that the ALJ follow a special technique when assessing the severity of mental

12

impairments. Specifically, the ALJ must evaluate the degree of functional loss – using the a five-point scale: none, mild, moderate, marked, and extreme – in three areas of functioning: activities of daily living; social functioning; and concentration, persistence, or pace; a four-point scale–none, one or two, three, four or more–is utilized to evaluate episodes of decompensation. 20 C.F.R. §416.920a(c)(4). In addition, the ALJ must document application of this technique in the written decision. 20 C.F.R. §416.920a(e)(2) ("[T]he written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph © of this section.").

Performing the psychiatric review technique, the ALJ found that Plaintiff had mild limitations in her activities of daily living, moderate limitations in social functioning, and moderate limitation in concentration, persistence, or pace (R. 20). The ALJ noted that Dr. Baddigam, Psychiatrist, observed she lived with her children and performed household chores, was able to manage funds, and care for her personal needs (Tr. 20, referring to 183-85). On this basis, the ALJ concluded that Plaintiff was not significantly limited in her activities of daily living.

In finding that Plaintiff had a moderate degree of limitation regarding social functioning, the Plaintiff testified that she has no friends and that she isolates herself (R. 584). She also stated that she had no relationship with most of her family (R. 585). In September of 2001, she told Dr.

13

Qudir that she did not get along with family and had limited contact with neighbors (Exhibit P. 498). Based on this evidence, the ALJ rated Plaintiff's degree of limitation for social functioning as "moderate." (R. 20).

The ALJ found a moderate degree of limitation regarding Plaintiff's concentration, persistence and pace (R. 20). Supporting this finding, the ALJ cited to Dr. Qudir's September 2001 report in which claimant's memory was intact and she was able to follow the doctor's instructions (R. 499). At the hearing, Plaintiff testified to decreased concentration (R. 584). Therefore, the ALJ found the degree of limitation to be "moderate."

In regards to the last factor of the technique, the ALJ rated the degree of limitation with respect to decompensation as "none" (R. 20-1), because the evidence did not indicate any episodes of deterioration or decompensation since the application filing date (R. 20). The ALJ acknowledged the Plaintiff's history of suicide attempts during her teenage years but noted that there had been no attempts within the last two years. Further, there was no indication that a minimal increase in mental demands would cause the Plaintiff to decompensate (R. 21). Based on findings of moderate limitations regarding social functioning and concentration. persistence and pace, the ALJ restricted Plaintiff's work environment to only simple and routine tasks, a low stress work environment and limited contact with the public (R. 21).

Plaintiff contends that because she was found disabled on June 1, 2001, the ALJ was obliged to find her disabled absent a "an event, an examination, exacerbation, crisis or some criteria to distinguish May 31, 2001 from June 1, 2001." (Dkt. #11 p.7). The ALJ relied on the findings made during the relevant period, not those made at a later time. For example, during Dr. Qudir's September 2001 psychiatric evaluation of plaintiff, she told him her depression had

14

"worsened in the last few months and recently she has started to hear voices. . ." (R. 498). Plaintiff's complaints to the psychiatrist show that her mental condition worsened in the few months prior to the September 2001 evaluation. The Appeals Council did not direct the ALJ to find Plaintiff disabled; they ordered him to further evaluate the effect of her mental impairments in accordance with the special technique described in 20 C.F.R. §416.920a, give Plaintiff and counsel the opportunity to examine the medical evidence from the Detroit Medical Center regarding Plaintiff's physical condition and give further consideration to the claimant's maximum RFC providing appropriate rationale (R. 536). The ALJ did all these things.

The ALJ was limited to considering the evidence during the relevant period only. Because substantial evidence supports the ALJ's conclusion that Plaintiff's was not disabled during the relevant period, the decision should not be overturned.

*ii. Plaintiff was afforded a full and fair hearing*

Plaintiff argues that because her attorney filed a complaint against ALJ Varga for failing to provide a full and fair hearing to another client with sarcoidosis, she was denied a full and fair hearing. Other than general accusations that ALJ Varga prejudged the case because he had been reversed in this and another sarcoidosis case, Plaintiff provides no evidence of bias or a deficiency in due process afforded to her in this case. Further, her claim of arbitrariness is undermined by the record, which indicates that Plaintiff's psychiatric condition worsened in the few months after June 2001.

Her claim that the ALJ failed to consider the subsequent granting of benefits is misplaced, because the ALJ was to consider only the relevant period for which substantial evidence supported his decision. The question on selecting a precise onset date is a difficult one

15

which Congress has delegated to the Commissioner in the first instance. If reasonable minds could differ on the date selected then the determination is within the "zone of choice" granted to the Commissioner and will not be overturned by a court if evidence supports the finding as it does here. Her claim that she did not receive a full and fair hearing is found to be without merit and should therefore be denied.

  *iii. Obesity*

Plaintiff contends that the ALJ failed to properly consider her obesity and its impact on her ability to work in light of her knee and joint pain, asthma and sarcoidosis (Dkt. #11, p. 9-10). Plaintiff argues further that the ALJ should have considered the subsequent favorable State agency determination finding that her weight gain was a function of her mental impairment. (Dkt. #11, p. 10). There is no evidence in the record that Plaintiff's weight condition exacerbated her well-documented impairments. Given the clinical findings as to Plaintiff's abilities such as strength, range of motion and no significant restrictions from the sarcoidosis, the ALJ limited Plaintiff to sedentary work with a sit/stand option at will. The RFC finding which accommodates Plaintiff's condition, including her obesity, indicates that the ALJ gave adequate consideration to the impact of Plaintiff's obesity in this matter. Therefore, it is recommended that the ALJ's decision be affirmed.

**III. RECOMMENDATION**

For the reasons stated above there is substantial evidence supporting ALJ Bruning's decision. IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED. Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of

service of a copy hereof as provided for in 28 U.S.C. 8section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

*Note:* any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: May 23, 2008　　　　　　　　　　　　　　　s/Steven D. Pepe  
Ann Arbor, Michigan　　　　　　　　　　　　　　United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 23, 2008.

s/ Alissa Greer
Case Manager to Magistrate
Judge Steven D. Pepe
(734) 741-2298